(C. D. 139)

CINCINNATI TERMINAL WAREHOUSE, INC., ET AL. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided April 3, 1939)

*Tompkins & Tompkins* (*Allerton deC. Tompkins* and *J. Stuart Tompkins* of counsel) for the plaintiffs.

*Joseph R. Jackson*, Assistant Attorney General (*Daniel I. Auster, Webster J. Oliver, Daniel G. McGrath* and *Richard E. FitzGibbon*, special attorneys), for the defendant.

Before CLINE, EVANS, and KEEFE, Judges; CLINE, J., not participating

EVANS, Judge: This is an action against the United States wherein the importers seek recovery of certain sums of money claimed to have been illegally exacted on importations of whisky entered at the port of Cincinnati, Ohio. The basis of the claim is that the proof of said liquor was incorrect. An additional claim is made that the Liquor Taxing Act of 1934 (48 Stat. L. 313) is illegal, null, and void. The latter claim was not pressed in the trial, in fact, such claim could not be successfully maintained in view of the decision in the case of *E. & J. Burke, Ltd.* v. *United States*, 24 C. C. P. A. 359, T. D. 48805. In that case it was specifically overruled. Following that decision we overrule a similar claim here. This leaves the controversy to be one of fact and not of law, viz, was the proof of this liquor 101 or was it 100 or less?

The provisions of the taxing act involved are as follows:
Sections 1 and 2, Liquor Taxing Act of 1934, 48 Stat. 313:

Sec. 1. This Act may be cited as the "Liquor Taxing Act of 1934."

Sec. 2. Paragraphs (3) and (4) of subdivision (a) of Section 600 of the Revenue Act of 1918, as amended (relating to the tax on distilled spirits generally and the tax on distilled spirits diverted for beverage purposes) * * * are amended to read as follows:

(3) On and after January 1, 1928, and until the effective date of Title I of the Liquor Taxing Act of 1934, $1.10 on each proof gallon or wine gallon when below proof and a proportionate tax at a like rate on all fractional parts of such proof or wine gallon; and

(4) On and after the effective date of Title I of the Liquor Taxing Act of 1934, $2.00 on each proof gallon or wine gallon when below proof and a proportionate tax at a like rate on all fractional parts of such proof or wine gallon.

Section 3249 of the Revised Statutes reads as follows:.

Proof spirits shall be held to be that alcoholic liquor which contains one-half its volume of alcohol of a specific gravity of .7939 at sixty degrees Fahrenheit.

It appears from the record that the merchandise was assessed at $5 per proof gallon under paragraph 802 of the Tariff Act of 1930 and $2 per proof gallon under the provisions of the Liquor Taxing Act of 1934 above quoted. This protest claims the Government had no right to assess the $2 per gallon under the Liquor Taxing Act because that act was null and void; that the only tax assessable on this importation was that provided in said paragraph 802 of the Tariff Act of 1930.

As we view the contest here there remains only an issue of fact to be passed upon, that is, was this liquor 100 proof as invoiced, or was it 101 proof as reported by the examining officers.

The testimony discloses that the examining officers made two tests of a sample taken from warehouse entry 68 covered by protest 698982–G; that they made four tests of the merchandise involved in protest 698984–G, consumption entry 405, and five tests of the merchandise involved in protest 698983–G, warehouse entry 67. Two samples were introduced in evidence. Some time after the examination and testing by the customs officials they caused a test to be made by chemists employed under the Bureau of Industrial Alcohol at Cincinnati. There is a variation between the results as given by the chemist of the Bureau of Industrial Alcohol and as reported by the customs officials, varying as high as .8 of 1 per centum, the chemist's report showing a proof of 100.7 while the highest test by the customs officers was 101.5 and the lowest 101.2 proof. Each of these tests was claimed to have been made according to the directions given by the Customs Regulations of 1931, article 1364, in effect at the time of entry. The tests made by the customs officers give the indication of the hydrometer and the temperature at which the liquor was tested. They show that the tests were made under very nearly uniform conditions. In the test made under warehouse entry 67 the temperature

was constant at 79 degrees Fahrenheit, and of course the reading was the same every time. In the test made under warehouse entry 405 the indication varied only 1 degree and the temperature 2 degrees. Two of the tests indicated a reading of 102 at a temperature of 62 degrees and two a reading of 103 at a temperature of 64 degrees, so that the first and second tests must have been made at approximately the same time and the third and fourth at the same time. In the first test under warehouse entry 68 the indication was 106 at 75 degrees; the second test the indication reading was 107 at a temperature of 74 degrees. The chemists did not give the reading under the temperature in their reports in evidence, but on cross-examination the chemist who testified as to the method of reading the hydrometer gave evidence as follows:

X Q. Do you recall at what angle you looked at the liquid?—A. I read the hydrometer stem from underneath, looking up, at an angle of probably 10 or 15 degrees.

In this connection we call attention to the fact that the Gauging Manual in effect at the date of these importations provides that the reading shall be made in the following manner:

PAR. 47. In reading the indication upon the stem the condition of the spirits immediately surrounding it will be noted—that is, whether the collection of air bubbles or the rising of the spirits by capillary attraction is likely to mislead in determining the true indication—and the first line below the general surface of the spirits will be read. Should the first line below the surface be clearly submerged more than five-tenths (that is, more than one-half) of the distance between two lines on the stem, and these tenths of submergence added to the tenths of true percent shown in the table make nearly a unit (that is, at least eight-tenths), there will be added a full percent to the proof shown in the table for the given indication and temperature, and the result will be the true proof. In such case the sign + (plus) will be appended to the hydrometer reading as reported on the returns. (U. S. Treasury Bureau of Industrial Alcohol, 1934, Gauging Manual, Article IV par. 47.)

The importer caused tests to be made of samples taken from the imported liquor by a commercial chemist in Cincinnati who gives in detail his method of procedure. Apparently one of the tests was made shortly after the liquor arrived at Cincinnati and the other a few days before the case was called for trial. The proof identifies the samples examined quite satisfactorily, in fact, the examination made just before the trial was of liquor given to the importer by the collector of customs at Cincinnati and was from one of the samples in evidence. The commercial chemist testified that he not only made tests by a Government tested hydrometer but that he had tested his hydrometer by a pycnometer and that he also made a pycnometer test or tests of each sample. Both he and the Government chemist from the Bureau of Industrial Alcohol testified that tests made by pycnometer are more accurate than those made by hydrometer. This witness described in

detail his method of testing the samples. The results of his tests were introduced Exhibits 1 and 2 and, so far as they assume to state facts, are as follows:

Alcohol by Government Hydrometer, 50% or 100 proof.
Alcohol by Specific Gravity with 25 cc. Pycnometer Bottle (Gov. standard), 49.96% or 99.92 proof.
Alcohol by Specific Gravity with 55 cc. Pycnometer Bottle (Gov. standard), 49.92% or 99.84 proof.
These three check duplicate analyses, by different methods, and apparatus, shows this whiskey to average a fraction under 100 proof.

The above test was made March 16, 1934.
The test made on November 10, 1934, was as follows:

Alcohol by Government Hydrometer; 50% or 100 proof.
Alcohol by Specific Gravity with 25 cc. (Pycnometer Bottle (Gov. standard), 49.95% or 99.90 proof.
Specific Gravity at 15.6° C. (60° Fahr.), 0.93454.
Government Hydrometer test showed on sample 106 proof at 75° Fahr. which according to U. S. Treasury Gauging Manual, January 1934, is 99.8 proof.
Check #2 on same sample showed 103 proof at 68° Fahr. which according to U. S. Treasury Gauging Manual, January 1934, is 99.7 proof.

In addition to the so-called scientific testimony the importers brought witnesses from the distilling plant in Canada one of whom was a Canadian excise officer. They described the method of testing the liquor as bottled. They both gave evidence that the last test was made within perhaps fourteen minutes of its bottling. The effect of this testimony was that had the proof been higher than 100 such fact would have been required to have been noted on the labels placed upon the liquor. In view of the fact that the commercial chemist appears to have been more exact and careful in his determination, coupled with the supporting testimony from those familiar with the liquor at the time of bottling, we are of the opinion that the protests should be and the same are hereby sustained insofar as they claim that the internal-revenue tax should be assessed upon the liquor in question on the basis of 100 U. S. proof as invoiced.

Judgment will be rendered accordingly. It is so ordered.