(C. D. 1090)

CUMMINS–COLLINS DISTILLERIES v. UNITED STATES

United States Customs Court, Third Division

(Decided March 11, 1948)

*Skaggs, Hays & Fahey* (*Joseph R. Rubin* of counsel) for the plaintiff.
*Paul P. Rao,* Assistant Attorney General (*Dorothy C. Bennett,* special attorney), for the defendant.

Before CLINE, EKWALL, and JOHNSON, Judges

JOHNSON, Judge: This case arises by means of a protest filed against the collector's assessments of duty and internal revenue taxes on some 4,200 barrels of Cuban rum. The collector at the port of Louisville, Ky., assessed duty thereon under paragraph 802 of the Tariff Act of 1930, as modified by the Mexican Trade Agreement, T. D. 50797, at the rate of $2.50 per proof gallon, less 20 per centum Cuban preferential, which reduced the rate to $2 per proof gallon. The internal revenue tax was assessed at $6 per proof gallon under Title 26, Section 2800 (a) of the U. S. Code, 1941–1946 Supplement. (Internal Revenue Code, as amended.)

Title 26,.U. S. Code 1940 ed. section 2809 (c) and (d), at page 2306 (Internal Revenue Code), defines proof spirits and proof gallon as follows:

(c) PROOF SPIRITS..

Proof spirits shall be held to be that alcoholic liquor which contains one-half its volume of alcohol of a specific gravity of seven thousand nine hundred and thirty-nine ten-thousandths (.7939) at sixty degrees Fahrenheit.

(d) GALLON.

In all sales of spirits a gallon shall be held to be a gallon of proof spirit, according to the standard prescribed in the preceding subsection, set forth and declared for the inspection and gauging of spirits throughout the United States.

The importer alleges that the number of proof gallons, as ascertained through the use of the hydrometer readings reported by the gauger, should have been used rather than the number of proof gallons determined by means of distillation of the rum, as reported by the Government chemical laboratory, and for that reason objects to the collector's assessments of duty and internal revenue taxes. Importer further alleges that neither the Secretary of the Treasury nor the collector of customs had adopted any regulations or given the importer sufficient notice that the proof of the rum would be determined by means of distillation or by any method other than that of the hydrometer.

At the trial it was stipulated and agreed between counsel for both sides that the facts relative to the collector's assessments of duties are as follows:

Mr. RUBIN: [For plaintiff] I am offering to stipulate. The merchandise in controversy is covered by 30 entries, filed at the port of Louisville, Kentucky, during the period of November 6, 1943 to March 17, 1944, both inclusive, and consists of a total of 4,262 barrels of rum exported from Cuba.

Mrs. BENNETT: [For the Government] So agreed.

Mr. RUBIN: At the time of entry, this rum was weighed on accurate scales and the proof thereof was determined by the use of the standard hydrometer. This was accomplished in a bonded customs warehouse, under the supervision of a United States Customs gauger, during the period of entry herein; the customs gaugers at the port of entry were not equipped to determine proof of distilled spirits by the distillation method.

Mrs. BENNETT: On the advice of the assistant collector at the port of entry, the Government so concedes.

Mr. RUBIN: It has been and still is the practice at the port of entry for Customs gaugers to determine proof of imported distilled spirits by the standard hydrometer.

Mrs. BENNETT: Upon the advice of the assistant collector, the Government so concedes.

Mr. RUBIN: The final dates of withdrawal on the 30 entries here involved were from November 17, 1943 to and including May 1, 1944.

Mrs. BENNETT: The records of the office of the assistant collector of Customs so show, and the Government so agrees.

Mr. RUBIN: With the exception of entry number 279, the collector transmitted samples for each of the entries here involved to the Customs laboratory at Baltimore, Maryland, with a request for determination of a true proof thereof.

Mrs. BENNETT: On advice of the assistant collector at the port of entry, the Government so agrees.

Mr. RUBIN: The results shown in the laboratory reports in the record from the Baltimore Customs chemists, represent their determination of proof of such samples by an accurate use of the distillation method; said laboratory reports may be received in evidence as collective exhibit number 1.

Mrs. BENNETT: The Government so agrees.  *  *  *

*       *       *       *       *       *  *       *

Mr. Rubin: Duties and internal revenue taxes paid at the times of withdrawal from the warehouse to—prior to liquidation of the entries, were based upon the proof determined by the hydrometer tests at the time of entry.

Mrs. Bennett: On advice of the assistant collector, the Government so concedes.

Mr. Rubin: Increased duties, and increased internal revenue taxes, subsequently paid pursuant to liquidation of entries were based upon the determination of proof as reported by the Customs laboratory in Collective Exhibit number 1.

Mrs. Bennett: On the advice of the assistant collector, it is so agreed, except that we find there were no increased duties in entry number 279.

Mr. Rubin: We so agree.

Mrs. Bennett: And, no laboratory report in that entry.

Mr. Rubin: We so agree.

Mrs. Bennett: The Government concedes to that extent.

Mr. Rubin: That is a complete statement of the uncontroverted facts. (Record pp. 18–22.)

One C. A. Boone, who was the plaintiff's auditor at the time the merchandise was entered, testified that upon arrival of the importations a local chemist was engaged to make complete analyses of the rum, including the ascertainment of proof; that the analyses disclosed that the true proof of the rum was not reflected by the hydrometer readings; and that the proof ascertained by means of the distillation method in making the analyses varied from one to three points above the proof obtained by means of the hydrometer. In view of such finding, the witness stated that the importer inquired of customs officials whether the customs tests for proofing could be made through distillation processes rather than with the hydrometer, but was advised that customs gaugers were supplied only with the hydrometer for testing purposes.

The witness further testified that the rum was bottled under the supervision of the United States storekeeper gauger employed by the Alcohol Tax Unit; that the Government furnished a hydrometer for proofing and that the rum was placed in bottles and the labels attached thereto showed the proof as was determined from such hydrometer readings. According to witness, the price at which the importer was allowed by the Office of Price Administration to sell the rum was based upon the proof shown upon the labels. And, inasmuch as the true proof had not been obtained by the Government from the laboratory at the time the merchandise was sold, the proof shown upon the labels, as required by the Federal Alcohol Administration to be specified, was less than the true proof thereof. Witness complained, therefore, that as the result of the O. P. A. limitation of profit per case to "In the neighborhood of $5.00," or "about 14 percent," (Record p. 53) the importer was prevented from passing along to the consumer any increase in price caused by the levy of increased duty and internal revenue taxes when the assessments were based upon the true proof of the rum.

The witness further testified that when the rum in question was imported there was a great element of hazard in the venture for the importer for the reason that if the war suddenly ended, or the Government stopped purchasing alcohol, the market naturally would take a sudden drop and, therefore, the importer, to protect its interest, turned the rum over to the trade as soon as possible. Consequently, witness stated, the importer was not prepared to await the return of true proof from the Government laboratory before disposing of the rum, even though definitely informed that such proof was being taken. The witness insisted that the importer had accepted in good faith the duty and tax assessments upon the basis of the hydrometer proof readings and made payment upon such basis at the time of withdrawal from warehouse and, therefore, the Government is estopped from making assessments upon any other basis.

The assistant collector of customs and acting appraiser at the port of Louisville, Ky., testified upon behalf of the importer that request was made to have the rum proofed by means of the distillation method and that the request was submitted to the Commissioner of Customs who ruled that distillation tests were not practical in the field.

Concerning the practice of the collector's office in proofing spirituous liquors, the witness testified that samples of all bulk spirits are forwarded to Government chemists for analyses unless such spirits from the same producer, in the same country, and of the same brand have previously been subjected to laboratory tests and by means of distillation determined not to contain an appreciable amount of nonvolatile matter.

This witness also testified on behalf of the Government that he proceeded under authority of T. D. 48809, dated February 10, 1937, section 27.43 of the Customs Manual of 1943, and chapter 13 of the Customs Gauging Manual of 1941 in forwarding the samples of the rum in question to the Government laboratory. On cross-examination he further testified that he knew of no instance where the instructions of the Commissioner of Customs to forward samples of such merchandise for laboratory tests had not been followed. He stated further that the Customs Gaugers Manual, 1941 ed., is a publication by the Government Printing Office and available for purchase by anyone desiring same.

The instructions from the Commissioner of Customs referred to, admitted in evidence as exhibit 2, are in the form of a publication which appears to have been issued by the Customs Information Exchange, New York. It sets out a communication from the Acting Commissioner of Customs to the collector at New York, evidently in reply to the collector's request for the Bureau's approval of a method of applying true proof for liquidation purposes to an entire importation of overproof spirits where such true proof differs from hydrometer

tests. The Acting Commissioner in the said communication drew attention to Bureau Circular Letter No. 2284, dated January 28, 1942, wherein it was stated that in order to determine whether distilled spirits contain saccharin or other nonvolatile substances, samples of such spirits, imported in barrels, should be sent to the customs laboratory for a report as to the true proof. He added also that he was of the opinion that the Bureau's circular letter referred to should be followed whenever practicable. The pertinent portion thereof was cited in the communication of the Acting Commissioner, as follows:

Since it is not always feasible to determine whether brandy and other distilled spirits contain saccharin or other nonvolatile substances, samples of such spirits, imported in barrels or similar packages, should be sent to the customs laboratory for a report as to the true proof. This will be unnecessary, however, in the case of any brand of imported distilled spirits which is known from recent laboratory tests to show no difference between its apparent and true proof.

No further evidence was offered by either party.

Motion made by Government counsel to dismiss the protest as to entry 295 on the ground that it was filed more than 60 days after liquidation, and conceded by counsel for the plaintiff to be filed too late to include such entry, is granted.

The numerous contentions of the plaintiff seem to be geared primarily to the equities of the imposition of duties and taxes upon the imported rum, and secondly to the legality of such assessments. If the only question involved were equitable relief for the plaintiff, and if this court had jurisdiction over same, the contentions of the plaintiff might be tenable. But it has long been held, however, that this court is a court of the United States of limited and special jurisdiction and without equitable jurisdiction. See *Julius C. Wolff (Inc.)* v. *United States*, 58 Treas. Decs. 404, T. D. 44310; *A. Jimeno et al.* v. *United States*, 2 Cust. Ct. 58, C. D. 87; *Harry A. Liebler* v. *United States*, Abstract 20022. In the latter citation this court stated:

It has often been held that this court is without equity jurisdiction, yet this protest seeks to have the court adopt the axiom of equity to the effect that the court will regard that done which should have been done. We do not believe that we have a legal right to apply the rules of equity to this, an essentially legal proceeding.

As to the legality of the assessments, first the plaintiff contends that duties and taxes based upon a proof determined in accordance with section 24.15 (b) of the Code of Federal Regulations, rather than upon a quantity determined in conformity with section 16.5 (d), as originally returned by the gauger, are illegal, and further, that he, the collector, erroneously estimated the duties and taxes by accepting the hydrometer gauge rather than following the provisions of section 8.21 (a). (See also Customs Regulations of 1943.)

We have examined the Code of Federal Regulations, Title 19, Vol. 5, section 24.15 (b), which refers to proofing by distillation, and which

is identical with Article 1378 of the Customs Regulations of 1937, and note the omission of same in the Code of Federal Regulations, Cumulative Supplement, Book 4, Title 19. The plaintiff makes no reference to the omission of section 24.15 (a) in the latter volume. Subsection (a) provided that proof be ascertained by the use of the hydrometer in accordance with the Customs Manual. Were plaintiff consistent, therefore, it would be further argued that the omission of section 24.15 (a) would also withdraw authority for assessment upon the basis of proof obtained with the hydrometer and force the acceptance of the proof strength shown upon the invoices. Nor is there any point in plaintiff's argument that section 24.15 (b) was superseded by section 16.5 (d), which declares that the basis of assessment of duty shall be the quantity determined on the original customs gauge, for the reason that the contents of that section is not new in the regulations. Section 14.6 (e) of the Code of Federal Regulations, Vol. 5, Title 19, is reprinted as section 16.5 (d) in substantially the same language in the Cumulative Supplement of the Code of Federal Regulations and also in the Customs Regulations of 1943.

Even if the omission of section 24.15 (a) and (b) from the Cumulative Supplement of the Code of Federal Regulations and the Customs Regulations of 1943 were interpreted as indicating that the Secretary of the Treasury no longer required the determination of true proof by distillation methods, when it may not otherwise be correctly ascertained, such omission would be entirely inadequate in effecting such result for the reason that paragraph 811 of the Tariff Act of 1930 (Title 19, U. S. Code, §1001, ch. 4) sets out plainly and specifically the standard for the determination of proof of spirituous liquors. Therefore, the absence of regulations is entirely immaterial. Also, regulations implying a procedure contrary to the clear intent of Congress have long been held to be ineffective and illegal.

Paragraph 811, referred to above, provides as follows:

PAR. 811. Each and every gauge or wine gallon of measurement shall be counted as at least one proof gallon; and the *standard for determining the proof of brandy and other spirits or liquors of any kind when imported shall be the same as that which is defined in the laws relating to internal revenue. The Secretary of the Treasury, in his discretion, may authorize the ascertainment of the proof of wines, cordials, or other liquors and fruit juices by distillation or otherwise, in cases where it is impracticable to ascertain such proof by the means prescribed by existing law or regulations.* [Italicized portions not quoted.]

The foregoing provision clearly outlines the means for ascertaining what is a proof gallon. See section 2809 (c) and (d) of the U. S. Code, *supra.* Further, it grants the Secretary of the Treasury permission to issue special instructions for the finding of the true proof, such as outlined in exhibit 2, *supra,* and as contained in the Customs Gauging Manual of 1941. Such instructions are designed to supplement the regulations rather than to be so promulgated.

The Gauging Manual of 1941, chapter IX, page 75, separates spirits into such as contain no nonvolatile substances and such as contain appreciable amounts of such substances. Chapter X of said Manual specifically outlines the methods of obtaining the true proof of spirits not containing nonvolatile substances. Chapter XIII outlines the methods of proofing spirits containing nonvolatile substances. The former is obtained with the use of the hydrometer and the latter by means of distillation. The statute, *supra*, together with chapters IX, X, and XIII of the Gauging Manual of 1941, presents ample authority to enable the collector to act in obtaining the true proof by laboratory methods without the issuance of either regulations or instructions. Indeed, under the law it was his duty to proceed as he did.

Further, as to the legality of the assessments, plaintiff argues that the collector illegally determined the gauge at the time of entry because the true proof was not ascertained by distillation methods, and that the determination thereof after withdrawal of the merchandise from warehouse was contrary to law for the reason that no regauge may legally be taken. In other words, it is asserted that the ascertainment by the collector of the true proof of the rum should be construed as a regauge of the merchandise.

The term "gauge" is defined by Funk & Wagnalls New Standard Dictionary, 1931 ed. as—

1. To determine by measurement or other test the content, dimensions, quantity, capacity, or power of; measure; test; as, to *gage* a cask; * * *

The term "proof" is defined in the same dictionary as follows:

Proof, * * * 3. Being of standard alcoholic strength, as liquors. See proof-spirit.

It is thus apparent that the gauger has a twofold duty in gauging alcoholic liquors. First, he is required to determine the quantity of the merchandise, or, as in the case in question, the weight of the rum. Having found the weight, his duty of gauging ordinarily would have been finished. However, the Congress, in its wisdom, realized the necessity of requiring that alcoholic liquors be assessed with duty upon the basis of the strength of the liquor. Therefore, the assessments were not only specified to be in units of a wine gallon but the strength of the liquor in a wine gallon was limited to not more than 100 proof. Consequently, it was further required that the gauger make a determination of the strength of spirituous liquors in order that the number of units of 100 proof could be properly ascertained therefrom and assessed with duty.

In the case at bar samples of the rum were sent to the laboratory for the determination of the true proof, or exact strength, in compliance with the law. Inasmuch as the statute also requires that the

amount of duty estimated to be payable thereon shall be deposited at the time of entry, unless entered for warehouse, and upon withdrawal if in warehouse (see sections 505 and 557, Tariff Act of 1930), it became the duty of the gauger to take what tests he could at the time of gauging in order to estimate the strength thereof at the time of importation. The quantity, however, according to section 315 of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938, must be shown as of the date of importation for the very good reason that under that section duties are based on the landed quantity. The weight of the rum in question, as reported by the gauger at the time of entry, is the same weight used by the collector in his liquidation of the entry. No change has been made in the gauger's original return of weight. The number of wine gallons, according to the Gaugers' Manual, is found by dividing the net weight by the weight per gallon at 60° F., as reported by the laboratory. The wine gallons thus obtained from the gauger's return of net weight is multiplied by the strength of true proof divided by 100 to obtain the number of proof gallons. It is presumed that the collector followed the method outlined in the Gauger's Manual. In fact, no evidence appears to the contrary.

The law provides that alcoholic liquors shall be dutiable at the appropriate rates applied to each proof gallon unit imported. The importer is presumed to know what the term "proof gallon" implies, and what the law provides. It is not the province of the collector to give notice to the importer that he intends to follow the law and levy duty and taxes upon the basis of the actual number of proof gallons rather than upon the basis of the estimated number.

Plaintiff also insists that payment of the estimated duties and taxes constituted the liquidation of the entries. Knowledge of what constitutes a liquidation is so elemental in customs jurisprudence that it seems quite unnecessary to discuss it at length here. In *Brune* v. *Marriott*, 4 Fed. Cases 475, the court stated that the payment of money upon estimated duties is rather in the nature of a deposit than a payment as it is subject to the final assessment of duties; and if more has been paid than is due, the surplus belongs to the importer and is returned. It is difficult to believe that the plaintiff is serious in its contention that the duties deposited upon withdrawal of the rum were the liquidated duties, or that the acceptance of the estimated duties precluded the collector from proceeding in accordance with law to liquidate the entries.

As a final effort to bolster his case, counsel for the plaintiff falls back on the age-old plea of the due process clause as provided for in the fifth amendment of the Constitution of the United States;

that is to say, he has been deprived of his day in court. But such far-fetched contention has no semblance of fact or foundation. The Congress has wisely provided the importer with a remedy against any unjust assessment that the collector might make. In the case at bar that privilege of appeal was exercised by the plaintiff in the filing of this protest.

Inasmuch as the importer evidently believed, according to the evidence adduced, that it was to its interest in order to avoid loss to withdraw the rum from warehouse as soon as possible and rush same to the retailers, importer must accept the consequences of its hasty action. Both the importer and the Government were aware of the rigid requirements that estimated duties be deposited with the collector in case of such withdrawal. Moreover, it is worthy of note that the plaintiff seems unduly exercised by reason of the fact that payment of more than the estimated amount of duties evidently prevented the realization of "the usual 14 percent profit" on the rum. And this, rather than the increase in the amount of duty, coupled with the fact that such increase could not be passed on to the consumer, appears to be the primary, if not the sole, reason for bringing this suit. The 14 per centum phase of the case is not pertinent to the issues before this court. But if that were the only claim of the plaintiff, we might observe in passing that the average business man, and indeed, many money-lending institutions, would count themselves fortunate to realize 14 per centum on investments. And if that issue were judicable here we would be inclined to disagree with plaintiff's plea for relief.

Also, if it were claimed that the proofing upon which the collector based the additional assessment was incorrect, and evidence was submitted to substantiate that contention, a different situation obviously would be before us for determination. See *Cincinnati Terminal Warehouse, Inc., et al.* v. *United States*, 2 Cust. Ct. 265, C. D. 139. However, the facts in the case at bar are clear that the collector faithfully carried out the intention of the Congress in levying duties and internal revenue taxes upon the importations in question. The Congress has the plenary power to prescribe the conditions under which importations may be made. It may absolutely prohibit importations of certain commodities or prescribe the conditions to which importers must adhere. See *Trustees of University of Illinois* v. *United States*, 20 C. C. P. A. 134, T. D. 45773, at page 139.

For the reasons stated we agree with Government counsel that it was the mandatory duty of the collector under the statute and regulations to assess duties and taxes on the basis of the correct number of proof gallons actually imported, and judgment will therefore be entered in favor of the Government.